No. 24-1156

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

289 KILVERT, LLC, successor in interest to
Paul and Barry Miller Partnership, LLC,

Plaintiff - Appellee,

v.

SBC TOWER HOLDINGS LLC,

Defendant - Appellant.

_____

Appeal from the United States District Court
District of Rhode Island

_____

## BRIEF OF APPELLANT
## SBC TOWER HOLDINGS LLC

_____

Dated: July 8, 2024

Steven M. Cowley
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110
(857) 488-4200
smcowley@duanemorris.com

James T. Huggard
BURNS & FARREY, P.C.
2 South Bolton Street
Marlborough, MA 01752
(508) 756-6288
huggard@burnsandfarrey.com

## Disclosure Statement

Pursuant to Rule 26.1(a), Appellant SBC Tower Holdings LLC discloses the following:

SBC Tower Holdings LLC is a Delaware limited liability company whose sole owner is NCWPCS MPL Holdings, LLC. NCWPCS MPL Holdings, LLC is jointly owned by New Cingular Wireless PCS, LLC and AT&T Investment & Tower Holdings, LLC. New Cingular Wireless PCS, LLC is wholly owned by AT&T Mobility II LLC. AT&T Mobility II LLC is jointly owned by BellSouth Mobile Data, Inc., AT&T Wireline Holdings, LLC, and AT&T Mobility LLC. BellSouth Mobile Data, Inc. is a wholly-owned subsidiary of AT&T Inc. AT&T Wireline Holdings, LLC is wholly-owned by AT&T DW Holdings, Inc. AT&T DW Holdings, Inc. is wholly-owned by BellSouth Mobile Data, Inc. AT&T Mobility LLC is jointly owned by New Cingular Wireless Services, Inc., BellSouth Mobile Data, Inc., SBC Long Distance, LLC, and AT&T Investment & Tower Holdings, LLC. New Cingular Wireless Services, Inc. is owned by AT&T NCWS Holdings, Inc. AT&T NCWS Holdings, Inc. is jointly owned by SBC Telecom, Inc. and BellSouth Mobile Data, Inc. SBC Telecom, Inc. is wholly-owned by AT&T Teleholdings, Inc., which is wholly-owned by

AT&T Inc. SBC Long Distance, LLC is wholly owned by SBC Telecom, Inc. AT&T Investment & Tower Holdings, LLC, is jointly owned by SBC Telecom, Inc., AT&T Capital Services, Inc., JVI General Partnership, and SBC Portfolio Holdings, Ltd. AT&T Capital Services, Inc. is jointly owned by Michigan Bell Telephone Company, Southwestern Bell Telephone Company, LLC, Wisconsin Bell, LLC, and AT&T Teleholdings, Inc. AT&T Teleholdings, Inc. is owned by AT&T Inc. Michigan Bell Telephone Company, Southwestern Bell Telephone Company, LLC, and Wisconsin Bell, LLC are each owned by AT&T Wireline Holdings, LLC. JVI General Partnership is jointly owned by AT&T Solutions, Inc. and AT&T Wireline Holdings, LLC. AT&T Solutions, Inc. is owned by AT&T Wireline Holdings, LLC. SBC Portfolio Holdings, Ltd. is owned by AT&T International Holdings, LLC, which is owned by AT&T Diversified Holdings, LLC, which is owned by AT&T DW Holdings, Inc. All are affiliates of AT&T Inc., a publicly traded company, and there is no one person or group that owns 10% or more of the stock of AT&T Inc.

DM2\19751192.7

# Table of Contents

Disclosure Statement ...................................................................... 2

Table of Authorities .................................................................... 6

Jurisdictional Statement ............................................................. 9

Introduction ................................................................................ 12

Statement of the Issue .............................................................. 15

Statement of the Case ............................................................... 15

Summary of the Argument ...................................................... 17

Argument ..................................................................................... 18

    A.    The District Court improperly interpreted a Rhode
              Island state law to displace the federal diversity
              jurisdiction statute. ............................................................... 18

           1.    Standard of Review. ............................................... 18

           2.    There is diversity jurisdiction. ................................... 19

           3.    The District Court erroneously interpreted a
                  choice of law provision in the Lease as if it were
                  an exclusive forum selection agreement between
                  the parties. ................................................................ 20

           4.    The District Court erroneously concluded Rhode
                  Island state law forecloses federal courts from
                  hearing landlord-tenant disputes involving Rhode
                  Island property ........................................................ 24

                  a.    When there is diversity, federal jurisdiction
                       is mandatory absent conditions not present
                       here. ................................................................... 26

DM2\19751192.7

b.    The District Court's interpretation of state law to preclude jurisdiction bestowed in a federal statute violates the Supremacy Clause. ................................................................ 30

c.    The District Court erroneously concluded that Rhode Island law attempts to allocate exclusive jurisdiction over landlord-tenant lawsuits between state and federal courts. ........ 32

Conclusion ................................................................................ 34

Certificate of Compliance ...................................................... 36

Certificate of Service ............................................................. 37

Addendum ............................................................................... 38

DM2\19751192.7

# Table of Authorities

CASES

*Ankenbrandt v. Richards*
504 U.S. 689 (1992) .................................................................. 29

*Burford v. Sun Oil Co.*
319 U.S. 315 (1943) ...............................................................26-28

*C.W. Downer & Co. v. Bioriginal Food & Science Corp.*
771 F.3d 59 (1st Cir. 2014) ..................................................... 21

*Chico Serv. Station, Inc. v. Sol P.R. Ltd.*
633 F.3d 20 (1st Circ. 2011) ......................................... 27, 29-31

*Cohens v. Virginia*
19 U.S. 264 (1821) .................................................................. 31

*Cummings v. Caribe Marketing & Sales Co., Inc.*
959 F. Supp. 560 (D.P.R. 1997) .............................................. 23

*Erie v. Tompkins*
304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ................... 24

*Forty Six Hundred LLC v. Cadence Educ., LLC*
15 F.4th 70 (1st Cir. 2021) ..................................................... 27

*Kingdomware Technologies, Inc. v. U.S.*
579 U.S. 162 (2016) ................................................................ 26

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*
523 U.S. 26 (1998) .................................................................. 26

*New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI)*
491 U.S. 350 (1989) ................................................................ 30

*Quackenbush v. Allstate Ins. Co.*
517 U.S. 706 (1996) ...................................................... 12, 26, 28

DM2\19751192.7

*Rafael Rodriguez Barril, Inc. v. Conbraco Industries, Inc.*
  619 F.3d 90 (1st. Cir. 2010) ...........................................................20-21

*Ribandeira v. New Balance Athletics, Inc.*
  65 F.4th 1 (1st Cir. 2023).................................................................21-23

*Romulus v. CVS Pharmacy, Inc.*
  770 F.3d 67 (1st Cir. 2014) ................................................................. 18

## STATUTES

28 U.S.C. § 1291................................................................................... 12

28 U.S.C. § 1332.........................................................................12, 17-19

28 U.S.C. § 1332(a) .............................................................9, 25-26, 30

28 U.S.C. § 1332(a)(2)........................................................................ 33

28 U.S.C. § 1441................................................................................... 12

Federal Arbitration Act...................................................................22-23

Massachusetts Uniform Arbitration Act .......................................... 23

R.I. GEN. LAWS §§ 8-8-1-2 ................................................................. 32

R.I. GEN. LAWS § 8-8-3(a)(2) ......................................................25, 28-29

R.I. GEN. LAWS § 34-18........................................................................ 25

R.I. GEN. LAWS § 34-18.1-9 ................................................................ 25

## OTHER AUTHORITIES

Fourth Amendment .............................................................................. 15

Black's Law Dictionary 241 (6th ed.1990).......................................... 23

Fed. R. Civ. Proc. 7.1 .......................................................................... 11

U.S. CONST. art. I, § 2 ......................................................................... 30

U.S. CONST. art. VI, cl. 2...................................................................... 31

DM2\19751192.7

United States Constitution Supremacy Clause .............. 14, 17, 26, 30, 34

DM2\19751192.7

## Jurisdictional Statement

There is federal diversity jurisdiction because there is complete diversity of citizenship between the parties and the amount in controversy is over $75,000. *See* 28 U.S.C. § 1332(a).

Defendant-Appellant SBC Tower Holdings LLC ("SBC Tower") is a limited liability company formed in Delaware with its principal place of business in Texas. (Appx. 5 ¶ 12) SBC Tower was not a citizen of Rhode Island at the time the Complaint in this lawsuit was filed and the case was removed. (Appx. 1-3) Instead, the citizenship of the SBC Tower entities on which a determination of diversity jurisdiction in this lawsuit depends was as follows:

- SBC Tower's sole member, NCWPCS MPL Holdings, LLC was a Delaware limited liability company with a principal place of business in Texas whose members were New Cingular Wireless PCS, LLC, and AT&T Investment & Tower Holdings, LLC.

- New Cingular Wireless PCS, LLC was a Delaware limited liability company with a principal place of business in Georgia. Its sole member was AT&T Mobility II LLC.

DM2\19751192.7

- AT&T Mobility II, LLC's members were AT&T Mobility LLC, a Delaware limited liability company with a principal place of business in Georgia, and BellSouth Mobile Data, Inc., a Georgia corporation with a principal place of business in Georgia.

- The members of AT&T Mobility LLC were SBC Long Distance, LLC, a Delaware limited liability company with a principal place of business in Texas; AT&T Investment & Tower Holdings, LLC, a Delaware limited liability company with a principal place of business in Texas; BellSouth Mobile Data, Inc.; and New Cingular Wireless Services, Inc., a Delaware corporation with a principal place of business in Georgia.

- The sole member of SBC Long Distance, LLC was SBC Telecom, Inc., a Delaware corporation with a principal place of business in Texas.

- The members of AT&T Investment & Tower Holdings, LLC were SBC Telecom, Inc., a Delaware corporation with a principal place of business in Texas; AT&T Capital Services,

DM2\19751192.7

Inc., a Delaware corporation with a principal place of business in Illinois; JVI General Partnership, a Delaware general partnership with a principal place of business in New Jersey; and BC Portfolio Holdings, Ltd., a Delaware corporation with a principal place of business in Texas.

- JVI General Partnership was owned by partners AT&T Solutions, Inc., a Delaware corporation with a principal place of business in New Jersey, and AT&T Corp., a New York corporation with a principal place of business in New Jersey.

Plaintiff-Appellee 289 Kilvert, LLC ("289 Kilvert") is a limited liability company organized under the laws of the state of Rhode Island and has its principal place of business in that state. (Appx. 5 ¶ 11) Although 289 Kilvert failed to comply with Fed. R. Civ. Proc. 7.1 in the District Court, or otherwise disclose the identity of its members, the District Court concluded that 289 Kilvert does not contest SBC Tower's representation that there is complete diversity of citizenship between the parties. (Add. 1 n. 1)

The amount in controversy, exclusive of interests and costs, exceeds $75,000. 289 Kilvert alleges that it is the assignee, owner, and lessor of

commercial property, and that SBC Tower, the alleged tenant, owes 50% of the payments allegedly received from up to six sublessees, at a minimum of $800 per sublessee per month, for a period of more than twenty years. (Appx. 7 ¶¶ 6, 8) As a result, 289 Kilvert claim it may terminate a lease for the property that carries a base rent value over $24,000 per year and that has more than five years remaining on its current extended lease term. (Add. 14-15 §§ 6-7 and Add. 17-18 § 2) Therefore, the U.S. District Court for the District of Rhode Island has jurisdiction, and removal was proper. 28 U.S.C. §§ 1332, 1441.

The District Court entered an Order remanding the case to Rhode Island state district court on February 8, 2024 ("Remand Order"). (Add. 3) An order to remand is appealable. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 715 (1996).

SBC Tower timely filed a notice of appeal on February 9, 2024. (Appx. 16-18) Thus, this Court has jurisdiction over this appeal. 28 U.S. Code § 1291.

## Introduction

This case involves a dispute concerning a lease for commercial property in Rhode Island on which a telecommunications tower is located.

DM2\19751192.7

SBC Tower, a one-time tenant under the lease, and its predecessors and successor rented the property for decades before 289 Kilvert acquired it in 2023. Within a few months of acquiring the property, 289 Kilvert sued SBC Tower in Rhode Island state court seeking eviction and hundreds of thousands of dollars in rent for a period stretching back more than twenty years. SBC Tower removed the case to U.S. District Court in Rhode Island because it is undisputed that there is complete diversity and the amount in controversy is over $75,000.

Nevertheless, the District Court remanded the case to Rhode Island state court. In its Order remanding the case, the District Court noted that the lease at issue includes a choice of law clause providing that the lease is governed by Rhode Island state law. The Court also observed that a Rhode Island statute assigns exclusive jurisdiction over eviction suits to the state district courts. The District Court reasoned that the case had to be remanded because of the combination of the choice of law provision in the lease and the District Court's interpretation of Rhode Island state law to prohibit removal.

The District Court was wrong. Its Remand Order effectively interprets the lease to include a mandatory forum-selection clause where

none exists. The lease simply requires that disputes—wherever they might be litigated—will be governed by Rhode Island law.

Further, the Rhode Island statute relied on by the District Court does not purport to restrict federal jurisdiction over any cases; it simply identifies which level of Rhode Island state trial courts will have jurisdiction over cases to be litigated in the state court system. And even if the state of Rhode Island had tried to restrict federal jurisdiction over eviction cases, the Supremacy Clause of the United States Constitution makes the federal diversity jurisdiction and removal statutes the controlling law in the resulting conflict, precluding remand premised on giving Rhode Island control over federal court jurisdiction.

This Court should reverse the Remand Order and hold that the District Court has jurisdiction over this case.

DM2\19751192.7

## Statement of the Issue

When federal diversity jurisdiction exists over a Rhode Island state court eviction Complaint and the defendant timely removes the lawsuit, does a Rhode Island choice of law provision in the parties' lease preclude the District Court from exercising its jurisdiction?

## Statement of the Case

289 Kilvert became the owner of commercial property in Warwick, Rhode Island ("Property") in 2023. (Appx. 66) A communications facility is located on a portion of the Property that is subject to a lease first executed in 1990. (Add. 14 § 1(b) and 15 § 8) Subsequently, the lease has been amended a number of times, most recently by the currently applicable Fourth Amendment (the original lease together with the amended terms through the Fourth Amendment shall be referred to as "the Lease" for convenience). (Add. 17-21) 289 Kilvert's Complaint arises out of a disagreement over the correct interpretation of a revenue sharing provision in the Lease.

289 Kilvert alleges that SBC Tower has been a tenant under the Lease for over twenty years.[1] (Appx. 7 ¶ 5) 289 Kilvert claims to have

---

[1] Many of the allegations in 289 Kilvert's Complaint are contested, including its allegation that SBC Tower remained the tenant under the Lease as of the time 289

DM2\19751192.7

been assigned the previous owner's rights to collect additional amounts under the Lease—amounts never claimed by the prior owner—when it purchased the Property last year. 289 Kilvert alleges that SBC Tower owes 50% of the rent from subleases, or a minimum of $800 per sublease per month (amounting to a minimum of $9,600 annually for such sublease), and further alleges that there were up to six potential subleases for which payments were not made over a more than twenty year period. (Appx. 7-8 ¶¶ 6-8)

289 Kilvert sued in Rhode Island state district court, claiming a right to terminate the Lease more than five years earlier than the current extended term (Add. 17-18 § 2), seeking eviction of SBC Tower, and demanding payment of over two decades of additional rent payments (among other monetary relief). (Appx. 8) SBC Tower timely filed a Notice of Removal to the U.S. District Court for the District of Rhode Island. (Appx. 4-6) 289 Kilvert then filed a Motion to Remand to State Court. (Appx. 27-63) The U.S. District Court for the District of Rhode Island

---

Kilvert acquired the Property. (*See* Add. 22-25) Given the procedural status of the case and the limited issue on appeal, SBC Tower does not address the issues raised by those factual disputes at this time.

DM2\19751192.7

granted 289 Kilvert's Motion. (Add. 1-4) SBC Tower filed a timely Notice of Appeal of the Remand Order. (Appx. 16-18)

## Summary of the Argument

It is undisputed that this case meets the requirements of diversity jurisdiction under 28 U.S.C. § 1332. (Add. 1 n.1) It also is undisputed that the Lease underlying 289 Kilvert's Complaint does not include a forum-selection clause requiring the parties to litigate their disputes in Rhode Island courts, let alone exclusively in a Rhode Island state court. Nevertheless, the District Court remanded the case to Rhode Island state court, holding that the Lease forecloses removal of 289 Kilvert's Complaint to federal court by operation of Rhode Island state law.

The District Court's Remand Order erroneously treats a basic choice of law provision in the Lease as if it were an exclusive forum selection agreement between the parties, relying in part on a misinterpretation of a Rhode Island statute assigning jurisdiction over various lawsuits between state courts to conclude that the state prohibits the exercise of federal court jurisdiction over those matters. Even if the Lease and Rhode Island's jurisdiction-assigning statute may be interpreted as the District Court interpreted them, the Supremacy

17

Clause of the United States Constitution requires the District Court to deny the Motion to Remand and exercise the federal court jurisdiction bestowed by Congress in the federal diversity jurisdiction statute. Accordingly, this Court should reverse the District Court's Remand Order.

## Argument

### A. The District Court improperly interpreted a Rhode Island state law to displace the federal diversity jurisdiction statute.

#### 1. Standard of Review.

A district court's jurisdictional determination on removal is subject to *de novo* review. *Romulus v. CVS Pharmacy, Inc.*, 770 F.3d 67, 73 (1st Cir. 2014). Under that standard, the District Court's Remand Order granting 289 Kilvert's Motion to Remand to State Court should be reversed because it is inconsistent with federal law. *See* § 1332.

## 2. There is diversity jurisdiction.

There is federal diversity jurisdiction under 28 U.S.C. § 1332 over this case because (1) there is complete diversity and (2) the amount in controversy exceeds $75,000.

*First*, there is complete diversity. 289 Kilvert is a Rhode Island limited liability company with its principal place of business in Rhode Island. (Appx. 5 ¶ 11) As set forth in detail above, SBC Tower is a limited liability company formed in Delaware with its principal place of business is in Texas. At the time of the filing of the Complaint, all of its members and corporate parents were citizens of Delaware alone, or Delaware and one of the following states: Texas, Georgia, New Jersey, Illinois, or New York. (Appx. 13; and 5 ¶ 12) Thus, complete diversity exists.

*Second*, the lawsuit seeks payment of additional rent far exceeding $75,000. In particular, it claims that SBC Tower owes 50% of the rent from up to six sublessees, at a minimum of $800 per sublessee per month, for a period of more than twenty years. Accordingly, it is undisputed that this case meets the requirements for diversity jurisdiction under § 1332. And even the District Court recognized this and acknowledged that 289

DM2\19751192.7

Kilvert does not challenge that the statutory requirements of diversity jurisdiction have been met. (Add. 1 n.1.)

> ### 3. The District Court erroneously interpreted a choice of law provision in the Lease as if it were an exclusive forum selection agreement between the parties.

The District Court did not premise its Remand Order on a finding that the parties agreed to an express forum selection designating Rhode Island state court as the mandatory forum for the resolution of disputes under the Lease. Simply, there is no forum-selection provision in the Lease and 289 Kilvert has not argued that there is. *See Rafael Rodriguez Barril, Inc. v. Conbraco Industries, Inc.*, 619 F.3d 90, 92 (1st. Cir. 2010) (recognizing the differences between choice of law and forum selection provisions and explaining that only the latter identify the court or courts where a suit must be brought).

Instead, the Court rested its Remand Order on a *choice of law* provision selecting Rhode Island law as applicable to the Lease. (Add. 1-4) According to the District Court, the parties' choice of Rhode Island law operates to impose a mandatory forum selection based on the District Court's interpretation of a Rhode Island statute allocating jurisdiction

among its state court for various causes of action. The District Court was wrong.

A choice of law provision does not, by itself, impose a mandatory forum selection for the resolution of disputes. *See Rafael Rodriguez Barril, Inc.*, 619 F.3d at 92 (explaining that a choice of law clause identifies the law that governs the contract); *see also C.W. Downer & Co. v. Bioriginal Food & Science Corp.*, 771 F.3d 59, 69 fn. 4 (1st Cir. 2014) (a contractual choice of law provision calling for the application of Saskatchewan law and plaintiff's consent jurisdiction in Saskatchewan did not amount to a mandatory forum selection agreement limiting jurisdiction to Saskatchewan courts). The District Court's conclusion otherwise is simply inconsistent with the law and First Circuit authority.

To be sure, parties are free to waive application of federal law such as the right to bring disputes in federal court where there is complete diversity and a sufficient amount in controversy. But here the Lease's choice of law provision does not contain a waiver of federal jurisdiction— let alone a clear and unequivocal waiver of that federal statutory right. *Cf. Ribandeira v. New Balance Athletics, Inc.*, 65 F.4th 1, 17 (1st Cir. 2023) (discussing the standard applicable to a determination whether

parties waived application of the Federal Arbitration Act in favor of exclusive application of a state arbitration act to proceedings seeking to vacate an award).

Specifically, the choice of law clause in the Lease provides only a generic agreement that Rhode Island state law will apply to its enforcement and construction:

> 10. Governing Law. Notwithstanding anything to the contrary contained in the Lease and this Agreement, the Lease and this Amendment shall be governed by and construed in accordance with the laws of the State or Commonwealth in which the Leased Premises is situated, without regard to the conflicts of laws provisions of such State or Commonwealth.

(Add. 19 § 10) There is no dispute that the Leased Premises is located in the state of Rhode Island. So, while the parties agreed that a court must look to Rhode Island law to resolve their dispute concerning the correct interpretation of the Lease's revenue sharing provision, the parties did not agree that the only court permitted to resolve their dispute must be a state court sitting in Rhode Island.

In *Ribandeira,* this Court recently rejected the same reasoning relied upon by the District Court to extend a generic choice of law provision into a waiver of federal statutory rights. *Ribandeira*, 65 F.4th

at 13-14. Specifically, *Ribandeira* rejected the appellant's (the respondent in the motion to vacate proceeding at the trial court) argument that the limitations period for motions to vacate under the Federal Arbitration Act was waived and did not apply to appellees' action because the license agreement applicable to the dispute included a Massachusetts choice of law provision and the Massachusetts Uniform Arbitration Act contains a materially shorter limitations period. *Id.* The court explained that "the mere inclusion of a generic choice-of-law clause within the arbitration agreement is not sufficient ... to support a finding that contracting parties intended to opt out of the FAA's default regime for vacatur of arbitral awards." *Ribandeira*, 65 F.4th at 13 (quotation marks and citations omitted).

Other district courts in this Circuit have recognized the distinction between general choice of law provisions and affirmative agreements limiting the parties' ability to pursue resolution of disputes under that applicable law solely in an exclusive forum. *See, e.g., Cummings v. Caribe Marketing & Sales Co., Inc.*, 959 F. Supp. 560, 564 (D.P.R. 1997):

> A choice of law clause is "[a] contractual provision wherein the parties designate the state whose law will govern disputes arising out of their agreement." Black's Law Dictionary 241 (6th

23

ed.1990) . . . . However, there is nothing in the plain language of the choice-of-law clauses at issue in this case that determines the forum for hearing disputes. The clauses merely state that New York law governs any disputes arising under the contracts, not that any such disputes must be heard exclusively in New York fora. Moreover, the Court cannot infer from the choice-of-law clauses a determination that would restrict disputes arising from the contracts to a particular forum. Nothing prevents this Court from making determinations based on state law—in fact, diversity jurisdiction demands it. *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

In short, although parties are free to waive jurisdiction over their disputes or objections to the exercise of jurisdiction over themselves in certain fora by means of mandatory exclusive forum selection provisions, the mere inclusion of a generic choice of law provision in a contract does not indicate an intention to waive the federal statutory right to pursue disputes in a neutral federal forum.

### 4. The District Court erroneously concluded Rhode Island state law forecloses federal courts from hearing landlord-tenant disputes involving Rhode Island property.

After determining that the parties chose Rhode Island state law to govern their Lease, the District Court then observed that Rhode Island law provides the "state 'district court shall have exclusive original

jurisdiction of … all actions between landlords and tenants pursuant to chapter 18 of title 34 ….'" (Add. 4) (quoting R.I. GEN. LAWS § 8-8-3(a)(2)).

Chapter 18 of title 34 of the Rhode Island General Laws provides:

> If, in any case of a letting covered by this chapter, … the landlord or reversioner wishing to repossess him or herself of the lands, building, or parts of buildings let, or recover possession of the same from the tenant … shall … institute a trespass and action for possession in the district court where the premises are situated ….

R.I. GEN. LAWS § 34-18.1-9. The District Court reasoned that these "provisions make clear that Rhode Island law dictates that eviction actions such as this one are to be brought in state district court" and erroneously extended that reasoning to conclude that Rhode Island state law thereby excluded federal courts from exercising jurisdiction over such actions. (Add. 2-3).

Thus, the District Court remanded the case to state court because a Rhode Island statute purports to vest jurisdiction over landlord-tenant disputes in state district courts, even though a federal statute vests jurisdiction over this case in the federal District Court. *See* § 1332(a).

The Court's reasoning is erroneous for at least three reasons. First, federal jurisdiction is mandatory when there is complete diversity.

Second, the District Court's interpretation of state law to preclude federal jurisdiction violates the Supremacy Clause. And third, the District Court erroneously concluded that Rhode Island law allocates exclusive jurisdiction between state and federal court.

### a. When there is diversity, federal jurisdiction is mandatory absent conditions not present here.

The federal diversity-jurisdiction statute is mandatory. It provides "The district courts *shall* have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states ...." 28 U.S.C. § 1332(a) (emphasis added and internal notations omitted). The word "shall" connotes a requirement and normally creates an obligation impervious to judicial discretion. *See Kingdomware Technologies, Inc. v. U.S.,* 579 U.S. 162, 171-72 (2016) (citing *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)). Accordingly, federal "courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush*, 517 U.S. at 716.

There are limited circumstances in which a federal district court may decline to exercise jurisdiction in diversity cases. *See, e.g.*, *Burford v. Sun Oil Co.*, 319 U.S. 315, 317-318 (1943) (explaining that federal

26

courts can abstain from exercising jurisdiction in a case that involves the interpretation of a complex state regulatory scheme). However, 289 Kilvert's Motion to Remand did not claim that any exception to the exercise of jurisdiction applied to this case. In fact, it did not cite a single federal law or case, nor did it identify a legal doctrine pursuant to which the District Court could decline to exercise jurisdiction. (Appx. 27-33)

In its Memorandum in Opposition to Plaintiff's Motion to Remand to State Court, SBC Tower anticipated that 289 Kilvert might eventually try to assert some federal-law ground for remand. (Appx. 82-89) For example, SBC Tower explained why one abstention doctrine in particular—Burford Abstention—does not apply, in the event 289 Kilvert were to assert that it does. (Appx. 84-88) (citing *Burford*, 319 U.S. at 726). As SBC Tower explained, the Rhode Island landlord-tenant and eviction laws do not create the kind of complex administrative scheme at issue in *Burford*, and exercising federal jurisdiction over the Lease dispute would not interfere with any state policy or proceeding. (*Id.*) (citing *Forty Six Hundred LLC v. Cadence Educ., LLC*, 15 F.4th 70 (1st Cir. 2021); *Chico Serv. Station, Inc. v. Sol P.R. Ltd.*, 633 F.3d 20, 32 (1st Circ. 2011)).

DM2\19751192.7

In its Reply to SBC Tower's Memorandum in Opposition, 289 Kilvert suggested that Burford Abstention could apply because adjudicating the case in federal court threatened to frustrate Rhode Island's landlord-tenant regulations. (Appx. 90-93) 289 Kilvert claimed that "proper domestic policy and interest rests in carrying out R.I. GEN. LAWS § 8-8-3(a)(2)." (Appx. 93-94) (citing *Quackenbush*, 517 U.S. 706). Finally, 289 Kilvert argued there is a compelling state interest in adjudicating eviction actions in state court because the parties have an interaction with the forum state. (*Id.*)

However, 289 Kilvert did not argue that *Quackenbush*, *Burford*, or any other federal authority required, or even permitted, abstention in this case. Instead, 289 Kilvert relied on the observation that the state district court has jurisdiction because "there is a statute indicating original and exclusive jurisdiction for evictions." (Appx. 92) It concluded that SBC Tower's "attempt to avoid itself [sic] of the original jurisdiction statute to the state court, despite being faced with a commercial eviction, consequently, ignores this statute in Rhode Island." (Appx. 92-93) Thus, 289 Kilvert's argument was not that a federal abstention doctrine

DM2\19751192.7

supported remand; instead, its theory was Rhode Island state law required remand.

Accordingly, when the District Court remanded the case to state district court, it did not find that a federal abstention doctrine applies. Rather, the District Court expressly held "this is not an issue of abstention." (Add. 3) It explained that "removal to this Court was improper" because the "parties agreed that Rhode Island law governed, and because Rhode Island law, § 8-8-3(a)(2), mandates the state district court as the proper court for this action …." (Add. 3) In this way, the District Court explained that it ordered remand not because a federal law or legal doctrine required it to do so, but because it deferred to its understanding of Rhode Island's prohibition of removal of an eviction proceeding to federal court. (*Id.*)

Like the U.S. Supreme Court, this Court has held that "federal courts have a 'virtually unflagging … obligation to exercise the jurisdiction given them.'" *Chico Serv. Station, Inc.*, 633 F.3d at 28-29 (quoting *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992)). The District Court's Remand Order ignored this obligation to exercise the jurisdiction vested by Congress in the diversity-jurisdiction statute. *See id.* at 29.

29

**b.   The District Court's interpretation of state law to preclude jurisdiction bestowed in a federal statute violates the Supremacy Clause.**

The Constitution provides that the "judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. I, § 2. The Constitution also requires that the "judicial Power shall extend … to Controversies … between Citizens of different States …." *Id.* § 2. Pursuant to those expressly-provided Constitutional requirements, Congress created federal districts courts and specified that they are to have original jurisdiction in all civil actions that, among other things, are between citizens of different states. 28 U.S.C. § 1332(a).

Consistent with those foundational elements, this Court has held that a federal court's "all but unyielding duty to exercise jurisdiction rests on 'the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible grounds.'" *Chico Serv. Station, Inc.*, 633 F.3d at 29 (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI)*, 491 U.S. 350, 359 (1989)). Indeed, "federal courts 'have no more right to decline the exercise of jurisdiction which is given, than to usurp

that which is not given.'" *Id*. (quoting, in a parenthetical explanation, *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)). Consequently, when a court sets aside the federal diversity-jurisdiction statute and declines to exercise the jurisdiction that Congress vested in it pursuant to the Constitution, it has usurped legislative power. *See Cohens*, 19 U.S. at 404.

Similarly, when a court is faced with two contradictory statutes—here, a federal law conferring jurisdiction on federal district courts in diversity cases, and a state law supposedly limiting jurisdiction exclusively to state district courts even in eviction cases involving complete diversity between the parties—the Constitution requires the court to uphold and enforce the federal statute.

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2. Stated differently, the federal diversity jurisdiction statute constitutes the supreme law of the land, notwithstanding the District Court's view that Rhode Island law prohibits the exercise of that jurisdiction. *Id*. The state of Rhode Island

has no authority to divest the federal District Court of jurisdiction bestowed on it by Congress.

The District Court applied the Constitutionally required hierarchy precisely backwards by concluding that it was bound by Rhode Island law not to uphold and enforce the federal diversity jurisdiction statute.

### c. The District Court erroneously concluded that Rhode Island law attempts to allocate exclusive jurisdiction over landlord-tenant lawsuits between state and federal courts.

The contradiction between Rhode Island state law and the federal diversity statute envisioned by the District Court's Remand Order is premised on a misinterpretation of the Rhode Island statute assigning jurisdiction over landlord-tenant disputes between state trial courts. In fact, the Rhode Island statute underlying the District Court's Remand Order does not purport to allocate jurisdiction between state courts and the federal District Court concerning eviction actions, or any other lawsuits.

The Rhode Island law is far more modest than that. It merely determines that the state district courts—as opposed to any of the other state or municipal trial courts in Rhode Island—will have original jurisdiction over certain cases. *See* R.I. GEN. LAWS §§ 8-8-1-2 (defining the

DM2\19751192.7

jurisdiction of the Rhode Island Supreme Court), 8-8-2-13 (same regarding the Rhode Island Superior Court), 8-18-3(a) (same regarding Rhode Island municipal courts and traffic tribunals). In this way, the Rhode Island statute merely identifies which state courts will hear and resolve landlord-tenant disputes that proceed in Rhode Island state courts. *Id.* § 8-8-3(a).

The Rhode Island statute underlying the Remand Order does not attempt to restrict the federal District Court's jurisdiction over any eviction cases in which qualifying diversity exists, nor any other cases. By giving the state district court exclusive jurisdiction over landlord-tenant disputes vis-à-vis other state trial courts, Rhode Island does not purport to exclude the federal District Court from exercising jurisdiction over landlord-tenant disputes that qualify for federal court jurisdiction.

In contrast to Rhode Island's goal of allocating its judicial resources among lawsuits that will be tried in state court, the federal diversity jurisdiction statute is designed to help citizens of different states obtain a neutral forum for resolution of their disputes over the threshold amount in controversy. *See* 28 U.S.C. § 1332(a)(2).

DM2\19751192.7

The purpose of Rhode Island's statute is fully served by limiting its application to assignment of jurisdiction between its own courts, without seeking to extend the state's control over lawsuits brought in, or removed to, federal courts. On the other hand, Congress's purpose in enacting its diversity jurisdiction and removal statutes would be thwarted by permitting a state to block parties' ability to access the federal District Court to resolve disputes qualifying under those federal statutes. Accordingly, the District Court's reliance on the Rhode Island statute to deprive the federal District Court of jurisdiction was not only a violation of the federal diversity jurisdiction statute, the Supremacy Clause, and the separation of powers guarantee, it was also a misinterpretation of the Rhode Island statute.

## Conclusion

Complete diversity of citizenship exists in this action and Defendant-Appellant SBC Tower timely filed a Notice of Removal transferring 289 Kilvert's Complaint from Rhode Island state district court to the federal District Court. For the reasons set forth in this Appellant's Brief, the District Court erred in entering its Remand Order in response to Plaintiff-Appellee's Motion to Remand. Accordingly, this

DM2\19751192.7

Court should reverse the Remand Order and direct the District Court to exercise its Congressionally bestowed diversity jurisdiction over 289 Kilvert's Complaint.

/s/ Steven M. Cowley
Steven M. Cowley
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110
(857) 488-4200
smcowley@duanemorris.com

James T. Huggard
BURNS & FARREY, P.C.
2 South Bolton Street
Marlborough, MA 01752
(508) 756-6288
huggard@burnsandfarrey.com

35

## Certificate of Compliance

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, even before excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 5,041 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Century Schoolbook 14 point font and contains 519 lines of text.

*/s/ Steven M. Cowley*
Steven M. Cowley

DM2\19751192.7

## Certificate of Service

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent out to those indicated as non-registered participants on this 8th day of July 2024.

*/s/ Steven M. Cowley*
Steven M. Cowley

# ADDENDUM

## Table of Contents

**Page**

Order Granting 289 Kilvert, LLC's Motion to Remand [D.R.I. Dkt. 11]......................................................................................... Add.1

28 U.S.C.A. § 1332 ............................................................. Add.5

R.I. Gen. Laws § 8-8-3 ..................................................... Add.10

Cellular Property Lease Agreement (Excerpt)................................ Add.12

The Fourth Amendment to Cellular Property Lease Agreement (Excerpt).. ...........................................................................Add.17

Assignment and Assumption of Cellular Property Lease Agreement (Excerpt)................................................... ......Add.22

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| 289 KILVERT, LLC, SUCCESSOR IN INTEREST TO PAUL AND BARRY MILLER PARTNERSHIP, LLC, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 1:23-CV-00530-MSM-PAS ) |
| SBC TOWER HOLDINGS, LLC, | ) ) |
| Defendant. | ) |

## ORDER

Mary S. McElroy, United States District Judge.

This is an eviction action originally (and properly) filed in the Rhode Island District Court, Third Division, which the plaintiff, 289 Kilvert, LLC, seeks to remand to that Court. (ECF No. 8.) The defendant, SBC Tower Holdings, LLC, first attempted to remove this matter to the Rhode Island Superior Court but the Third Division District Court denied that request and set a trial date. The defendant then removed the matter to this Court, on the grounds of diversity jurisdiction.[1]

The plaintiff is the owner and lessor of commercial property located at 289 Kilvert Street in Warwick, Rhode Island. When the plaintiff purchased the property, the previous owner assigned to the plaintiff its right to a Cellular Property Lease ("the Lease"). The defendant is the other party to that Lease.

---

[1] The plaintiff does not challenge that the statutory requirements of diversity jurisdiction are met. *See* 28 U.S.C. § 1332(a).

**Add.1**

The Lease provided a choice-of-law provision that states as follows:

> Law. This Agreement shall be governed by, construed and enforced in accordance with the law of the State of Rhode Island.
> (ECF No. 8-1 ¶ 24.)

The defendant and the plaintiff's predecessor in interest also executed a "Fourth Amendment" to the Lease that included the following provision:

> 10. Governing Law. Notwithstanding anything to the contrary contained in the Lease and this Amendment, the Lease and this Amendment shall be governed by and construed in all respects in accordance with the laws of the State or Commonwealth in which the Leased Premises is situated, without regard to the conflicts of laws provisions of such State or Commonwealth.
> (ECF No. 8-2 ¶ 10.)

These provisions make clear that the parties agreed that Rhode Island law will apply to and govern the Lease. Indeed, under Rhode Island law, "parties are permitted to agree that the law of a particular jurisdiction will govern their transaction." *Webster Bank, Nat'l Ass'n v. Rosenbaum*, 268 A.3d 556, 559-60 (R.I. 2022).

The question then turns to what the law to which the parties agreed to requires as pertinent to this Motion to Remand. Rhode Island law provides that the state "district court shall have exclusive original jurisdiction of … all actions between landlords and tenants pursuant to chapter 18 of title 34…." R.I.G.L. § 8-8-3(a)(2). Chapter 18 of title 34 in turn provides in relevant part:

> If, in any case of a letting covered by this chapter, … the landlord or reversioner wishing to repossess him or herself of the lands, building, or parts of buildings let, or recover possession of the same from the tenant … shall … institute a trespass and action for possession in the district court where the premises are situated…..
> R.I.G.L. § 34-18.1-9.

**Add.2**

These provisions make clear that Rhode Island law dictates that eviction actions such as this one are to be brought in state district court.

The defendant, citing *Forty Six Hundred LLC v. Cadence Educ.*, LLC, 15 F.4th 70, 74 (1st Cir. 2021), argues that this Court must exercise its diversity jurisdiction and cannot abstain by way of the *Burford* abstention doctrine.[2]  But this is not an issue of abstention.  This is an issue of enforcing what the parties agreed to in the Lease, and notably there is no indication that the parties in *Forty Six Hundred* agreed to state law, much less one that included the requirement that the action be filed in a particular court.  Here, because the parties agreed that Rhode Island law governed, and because Rhode Island law, § 8-8-3(a)(2), mandates the state district court as the proper court for this action, the defendant is bound by that requirement and removal to this Court was improper.

The Court therefore GRANTS the plaintiff's Motion to Remand (ECF No. 8) and REMANDS this matter to the Rhode Island District Court, Third Division, sitting in Kent County.

---

[2] "*Burford* allows a federal court to dismiss a case only if it presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *Forty Six Hundred LLC v. Cadence Educ.*, LLC, 15 F.4th 70, 75 (1st Cir. 2021).

**Add.3**

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge
February 8, 2024

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
     Part IV. Jurisdiction and Venue (Refs & Annos)
       Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1332

§ 1332. Diversity of citizenship; amount in controversy; costs [Statutory Text & Notes of Decisions subdivisions I to V]

Currentness

<Notes of Decisions for 28 USCA § 1332 are displayed in multiple documents.>

**(a)** The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

   **(1)** citizens of different States;

   **(2)** citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

   **(3)** citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

   **(4)** a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

**(b)** Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

**(c)** For the purposes of this section and section 1441 of this title--

   **(1)** a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of--

     **(A)** every State and foreign state of which the insured is a citizen;

**(B)** every State and foreign state by which the insurer has been incorporated; and

**(C)** the State or foreign state where the insurer has its principal place of business; and

**(2)** the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

**(d)(1)** In this subsection--

**(A)** the term "class" means all of the class members in a class action;

**(B)** the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

**(C)** the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

**(D)** the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

**(2)** The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--

**(A)** any member of a class of plaintiffs is a citizen of a State different from any defendant;

**(B)** any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

**(C)** any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

**(3)** A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of--

**(A)** whether the claims asserted involve matters of national or interstate interest;

**(B)** whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

**(C)** whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

**(D)** whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

**(E)** whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

**(F)** whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

**(4)** A district court shall decline to exercise jurisdiction under paragraph (2)--

**(A)(i)** over a class action in which--

**(I)** greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

**(II)** at least 1 defendant is a defendant--

**(aa)** from whom significant relief is sought by members of the plaintiff class;

**(bb)** whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

**(cc)** who is a citizen of the State in which the action was originally filed; and

**(III)** principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

**(ii)** during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

**(B)** two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

**(5)** Paragraphs (2) through (4) shall not apply to any class action in which--

**(A)** the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

**(B)** the number of members of all proposed plaintiff classes in the aggregate is less than 100.

**(6)** In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

**(7)** Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

**(8)** This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

**(9)** Paragraph (2) shall not apply to any class action that solely involves a claim--

**(A)** concerning a covered security as defined under 16(f)(3)[1] of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)[2]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

**(B)** that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

**(C)** that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

**(10)** For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

**(11)(A)** For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

**(B)(i)** As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the

plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

**(ii)** As used in subparagraph (A), the term "mass action" shall not include any civil action in which--

**(I)** all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

**(II)** the claims are joined upon motion of a defendant;

**(III)** all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

**(IV)** the claims have been consolidated or coordinated solely for pretrial proceedings.

**(C)(i)** Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

**(ii)** This subparagraph will not apply--

**(I)** to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

**(II)** if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

**(D)** The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

**(e)** The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

## CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 930; July 26, 1956, c. 740, 70 Stat. 658; Pub.L. 85-554, § 2, July 25, 1958, 72 Stat. 415; Pub.L. 88-439, § 1, Aug. 14, 1964, 78 Stat. 445; Pub.L. 94-583, § 3, Oct. 21, 1976, 90 Stat. 2891; Pub.L. 100-702, Title II, §§ 201(a), 202(a), 203(a), Nov. 19, 1988, 102 Stat. 4646; Pub.L. 104-317, Title II, § 205(a), Oct. 19, 1996, 110 Stat. 3850; Pub.L. 109-2, § 4(a), Feb. 18, 2005, 119 Stat. 9; Pub.L. 112-63, Title I, §§ 101, 102, Dec. 7, 2011, 125 Stat. 758.)

Notes of Decisions (989)

West's General Laws of Rhode Island Annotated
Title 8. Courts and Civil Procedure--Courts
Chapter 8. District Court

Gen.Laws 1956, § 8-8-3

§ 8-8-3. Jurisdiction

Currentness

(a) The district court shall have exclusive original jurisdiction of:

(1) All civil actions at law, but not causes in equity or those following the course of equity except as provided in § 8-8-3.1 and chapter 8.1 of this title, wherein the amount in controversy does not exceed five thousand dollars ($5,000);

(2) All actions between landlords and tenants pursuant to chapter 18 of title 34 and all other actions for possession of premises and estates notwithstanding the provisions of subsection (c) of this section;

(3) All actions of replevin where the goods and chattels to be replevied are of the value of five thousand dollars ($5,000) or less;

(4) All violations of minimum housing standards whether established by chapter 24.3 of title 45 or by any municipal ordinance, rule, or regulation passed pursuant to the authority granted either by chapter 24.2 of title 45 or by special act of the general assembly governing minimum housing standards; except that in the event the city of Providence or town of North Providence shall by ordinance create a court for the purpose of exercising jurisdiction over violations of minimum housing standards, Providence Municipal Zoning Code and the Rhode Island State Building Code, chapter 27.3 of title 23, concerning properties which are not owned by the state, upon enactment of the ordinance, that court shall have exclusive original jurisdiction of violations of the above listed codes and standards as defined herein occurring within the city of Providence or the town of North Providence, and the district court shall be without jurisdiction over those actions;

(5) All suits and complaints for offenses against the bylaws, ordinances, and regulations of cities and towns whether passed by the cities or towns or under the law by the properly constituted authorities thereof;

(6) All other actions, proceedings, and matters of whatever nature which are or shall be declared to be within the jurisdiction of the court by the laws of the state.

(b) The district court shall also have any special jurisdiction which is or may be conferred by charter or law upon justices of the peace if no special court exists or is created by charter or law for that purpose.

(c) The district court shall have concurrent original jurisdiction with the superior court of all civil actions at law wherein the amount in controversy exceeds the sum of five thousand dollars ($5,000) and does not exceed ten thousand dollars ($10,000);

Provided, however, that in any such action, any one or more defendants may in the answer to the complaint demand removal of the action to the superior court, in which event the action shall proceed as if it had been filed originally in the superior court.

(d) The district court shall have special jurisdiction to grant relief as set forth under § 15-15-4(b)(1).

**Credits**

P.L. 1969, ch. 239, § 4; P.L. 1977, ch. 277, § 1; P.L. 1978, ch. 182, § 1; P.L. 1981, ch. 215, § 2; P.L. 1982, ch. 134, § 1; P.L. 1985, ch. 150, § 16; P.L. 1985, ch. 492, § 1; P.L. 1986, ch. 200, § 4; P.L. 1986, ch. 547, § 7; P.L. 1987, ch. 447, § 1; P.L. 1988, ch. 158, § 1; P.L. 1989, ch. 240, § 2; P.L. 1989, ch. 285, § 1; P.L. 1996, ch. 214, § 2.

Notes of Decisions (18)

Gen. Laws, 1956, § 8-8-3, RI ST § 8-8-3

Current with effective legislation through Chapter 58 of the 2024 Regular Session of the Rhode Island Legislature.

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

CELLULAR PROPERTY LEASE

      This Cellular Property Lease Agreement is made and entered into this _1st_ day of _MAY_, 19_90_ by and between The Paul and Barry Miller Partnership, a Rhode Island General Partnership, (the "Lessor") and Providence Cellular Telephone Company, a Rhode Island General Partnership, having an address c/o Metro Mobile CTS, Inc., 110 East 59th Street, New York, New York 10022 (the "Lessee").

    1. <u>Premises</u>.

      (a) Lessor hereby leases to Lessee, the Lessee hereby hires and takes from Lessor, the real property with all improvements thereon described on Attachment A attached hereto and made a part hereof (the "Premises").

      (b) Lessor leases the Premises together with all appurtenances and improvements related thereto and with the right of such pedestrian, vehicular and utility ingress and egress to the Premises as Lessee shall deem necessary or appropriate to construct, alter, move, remove and maintain its Facilities (as hereinafter defined); and together with the right to construct, place, alter, move, remove and maintain the Facilities on, under and above the Premises. Lessor agrees to execute such documents as shall be necessary to carry out the intent of this paragraph including, without limitation, utility and ingress and egress easements on and to the Premises set forth on Exhibit C attached hereto and made part hereof.

      (c) Lessee accepts the obligatin to maintain and keep in good order and repair the easement during the term of the easement, which easement is further described on Exhibit C attached hereto and made a part hereof.

    2. <u>Approvals, Consents and Other Agreements</u>.

      (a) It is understood and agreed that the Lessee's ability to use the Premises for the purposes set forth in this Lease is contingent upon its obtaining, either before or after the effective date of this Lease, certain approvals. These approvals (the "Approvals") are all approvals, authorizations, licenses, consents and exemptions required to be issued by all cognizant governmental authorities, in order to construct and operate Lessee's cellular radio telecommunications system on the Premises and throughout the State of Rhode Island. In the event that any application for an Approval issued for the operations of the Lessee's Facilities is cancelled, expires, lapses, or is otherwise withdrawn or terminated by any governmental authority, so that the Lessee shall be unable to use the Premises for the specified purposes, the Lessee shall

have the right to terminate this Lease pursuant to this Paragraph 2. Notice of the Lessee's exercise of its right to terminate shall be given to the Lessor in writing by certified mail, return receipt requested. All rentals paid pursuant to this Lease to said termination date shall be retained by the Lessor. Upon such termination, this Lease shall become null and void and of no further force and effect and the parties shall have no further obligation, including the payment of money, to each other hereunder.

(b) It is also understood and agreed that the effectiveness of this Lease is contingent upon grant of the Easements attached hereto as Exhibit C, and obtaining all consents set forth on Attachment E. In the event that all of the Easements are not granted and consents not obtained, Lessee shall have no obligation to proceed with this Lease and this Lease shall be null, void and of no force or effect.

3. <u>Use of Premises</u>. During the term of this Agreement, Lessee shall have the right to do any and all acts necessary or desirable in order to conduct the following activities on the Premises:

(a)    to install radio antennas on the Lessee's tower located on the Premises substantially in accordance with the specifications set forth on Attachment C attached hereto and made a part hereof and once installed, to maintain said antennas and tower, keeping same in good order and repair;

(b)    to install Lessee's transmitting and receiving equipment and/or any related equipment in a building to be constructed at Lessee's option, and once installed, to keep same in good order and repair; and

(c)    to alter the Facilities from time to time at Lessee's sole discretion and expense to adapt to Lessee's business needs, provided that such alterations do not interfere with the then existing activities of Lessor.

Lessee at all times shall have exclusive use of and access to the Premises, and to all improvements and appurtenances related thereto. Lessor agrees not to use other property which it may own in such a way as would interfere in any respect with Lessee's use of the Premises as a communications facility, nor shall Lessor lease such property for an intended use which would so interfere with Lessee's use of the Premises. Lessee shall utilize the Premises for its cellular communications and related purposes. Subject to the foregoing, Lessee shall take no action which would interfere with Lessor's use of its property adjoining the Premises.

Add.13

4.  _Term_.  The Base Term (the "Base Term") of this Lease Agreement which Base Term shall be for a period of five (5) years, shall commence with the date of Lessee's exercise of the Option to Lease annexed to this Lease.  Once the commencement date of the Base Term is finally determined by Lessee, the parties hereto agree to execute, in recordable form, a Memorandum of Lease setting forth the said commencement date of the Base Term.

5.  _Option to Renew_.  Lessee is hereby granted three (3) options to renew this Lease Agreement following the Base Term for successive periods of five (5) years each, provided that this Lease is in full force and effect at the time of such renewal.  If Lessee wishes to exercise any option to renew this Lease as above provided, Lessee shall notify Lessor not later than five (5) months prior to the end of the Base Term of the then current renewal terms.  Failure to exercise any renewal options shall be deemed a waiver of any successive renewal option.

6.  _Rent_.

(a) During the Base Term, Lessee agrees to pay Lessor a monthly rental of Two Thousand Dollars ($2,000.00) per month, payable in advance, on the first day of a month, then the rental payment for such partial month shall be a prorated portion of $2,000.00.  Said prorated rental payment, if any, shall be due upon the commencement of the Base Term with respect to said Base Term.  The five (5) year Base Term shall be calculated beginning from the first day of the first full month following the Base Term.

(b) Lessee agrees to pay promptly, when due, all real estate taxes, water and sewer taxes for the leased Premises provided, however, that Lessee shall not pay or be responsible for transfer taxes, estate, inheritance, or succession taxes related to the Premises or by reason of Lessor's ownership or transfer of the Premises.  Lessee further agrees to provide evidence of payment of same to Lessor promptly as such taxes are paid.

(c) In the event that Lessee shall fail to pay any or all real estate, water and sewer, and other taxes related to the Premises, Lessee hereby empowers Lessor to pay same on its behalf as attorney-in-fact.  In the event of such payment, Lessor shall be entitled to immediate reimbursement from Lessee, together with interest thereon, computed at the highest legal rate permitted by law.

**Add.14**

(d) Upon renewal of this Lease, or upon the commencement of any renewal term hereof, Lessor reserves the right to adjust the rental amount in an amount not to exceed the increase in the Consumer Price Index, U.S. Average (1982 = 100), by giving Lessee written notice of such increase at least sixty (60) days in advance of the date on which such increase becomes effective.

7. <u>Rent During Renewal Terms</u>. In the event that Lessee exercises its renewal option(s) as promised above, each renewal shall be on the same terms and conditions as set forth herein.

8. <u>Facilities</u>. During the Base Term hereof and during all exercised renewal options, Lessee shall have the right to construct, install, operate and maintain such transmission and receiving equipment and related facilities on the Premises as Lessee shall deem necessary or appropriate in the conduct of its business operations, or in providing communication services to the public, including but not limited to, the equipment listed on Attachment C as part of the construction, installation and operation, which will be completed in a good and workmanlike manner, in accordance with governmental regulations, and free of any liens or claims for work, labor or services. Lessee may alter its Facilities from time to time at its expense as Lessee, in its discretion, deems appropriate. Lessor shall have no obligation whatsoever to construct, maintain, repair, alter or replace the Facilities or any part thereof, but may do so in the event of damage or destruction if requested by Lessor, or if elected by Lessee, at the termination of this Lease. At the termination of this Lease or sooner, Lessee shall in a safe, good, workmanlike manner, disassemble and remove all improvements, restoring the realty to its present unimproved condition, free and clear of all rubbish and debris.

9. <u>Representations of Lessor</u>.

(a) Except for the permitted liens and encumbrances set forth in Attachment B hereto, Lessor holds a good and marketable fee simple title to the Premises, free and clear of all liens and encumbrances.

(b) Lessor has full authority to enter into and perform this Lease.

(c) Lessor warrants and represents that it has complied, and will during the term of this Lease, comply with all in instruments and documents which affect the Premises, including, but not limited to, all mortgages, trusts, deeds, easements, covenants, statutes, regulations, and any other document or restriction which may affect the Premises.

**Add.15**

Miller (Warwick)
Page 10 of 11

IN WITNESS WHEREOF, the hereto have hereunto executed this Agreement on the date first above written.

WITNESSES:

LESSOR:

THE PAUL AND BARRY MILLER PARTNERSHIP, a Rhode Island General Partnership

By: _____
Paul R. Miller, General Partner

By: _____
Barry N. Miller, General Partner

WITNESSES:

LESSEE:

PROVIDENCE CELLULAR TELEPHONE COMPANY, a Rhode Island General Partnership

By: METRO MOBILE CTS OF PROVIDENCE, INC.

_____
Gary Schulman, Vice President

STATE OF RHODE ISLAND  )
                        ) ss:
COUNTY OF _____       )

The foregoing instrument was acknowledged before me this 2 day of _____, 1990, by Paul R. Miller, who acknowledged to me that he was a General Partner of The Paul and Barry Miller Partnership, a Rhode Island General Partnership, on behalf of said partnership, as its free act and deed.

_____
Notary Public
My Commission Expires: _____

ROGER R. TRAVERS, Notary Public
State of R. I. and Providence Plantations
My Commission Expires June 30, 1991

**Add.16**

### THE FOURTH AMENDMENT TO LEASE AGREEMENT

This Fourth Amendment to Lease Agreement (this "***Amendment***") is made effective as of the latter signature date hereof (the "***Effective Date***") by and between **Paul and Barry Miller Partnership, LLC**, a Rhode Island limited liability company ("***Landlord***") and **SBC Tower Holdings, LLC**, a Delaware limited liability company ("***Tenant***") (Landlord and Tenant being collectively referred to herein as the "***Parties***").

### RECITALS

**WHEREAS,** Landlord owns the real property described on **Exhibit A** attached hereto and by this reference made a part hereof (the "***Parent Parcel***"); and

**WHEREAS,** Landlord (or its predecessor-in-interest) and Tenant (or its predecessor-in-interest) entered into that certain Cellular Property Lease dated May 1, 1990 (as the same may have been amended from time to time, collectively, the "***Lease***"), pursuant to which the Tenant leases a portion of the Parent Parcel and is the beneficiary of certain easements for access and public utilities, all as more particularly described in the Lease (such portion of the Parent Parcel so leased along with such portion of the Parent Parcel so affected, collectively, the "***Leased Premises***"), which Leased Premises are also described on **Exhibit A**; and

**WHEREAS,** Tenant entered into that certain Sublease Agreement dated December 14, 2000 with Southern Towers, Inc., predecessor-in-interest to American Tower Asset Sub II, LLC ("***American Tower***"), whereby American Tower subleases the Leased Premises from Tenant; and

**WHEREAS,** Landlord and Tenant desire to amend the terms of the Lease to extend the term thereof and to otherwise modify the Lease as expressly provided herein.

**NOW THEREFORE,** in consideration of the foregoing recitals and the mutual covenants set forth herein and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **One-Time Payment.** Tenant shall pay to Landlord a one-time payment in the amount of **Two Hundred Twenty-Five Thousand and No/100 Dollars ($225,000.00)**, payable within thirty (30) days of the Effective Date and subject to the following conditions precedent: (a) Tenant's receipt of this Amendment executed by Landlord, on or before May 1, 2017; (b) Tenant's confirmation that Landlord's statements as further set forth in this Amendment are true, accurate, and complete, including verification of Landlord's ownership; (c) Tenant's receipt of any documents and other items reasonably requested by Tenant in order to effectuate the transaction and payment contemplated herein; and (d) receipt by Tenant of an original Memorandum (as defined herein) executed by Landlord.

2. **Lease Term Extended.** Notwithstanding anything to the contrary contained in the Lease or this Amendment, the Parties agree the Lease originally commenced on May 1, 1990 and, without giving effect to the terms of this Amendment but assuming the exercise by Tenant of all remaining renewal options contained in the Lease (each an "***Existing Renewal Term***" and, collectively, the "***Existing Renewal Terms***"), the Lease is otherwise scheduled to expire on April 30, 2030. In addition to any



Existing Renewal Term(s), the Lease is hereby amended to provide Tenant with the option to extend the Lease for each of ten (10) additional five (5) year renewal terms (each a "*New Renewal Term*" and, collectively, the "*New Renewal Terms*").    Notwithstanding anything to the contrary contained in the Lease, (a) all Existing Renewal Terms and New Renewal Terms shall automatically renew unless Tenant notifies Landlord that Tenant elects not to renew the Lease at least sixty (60) days prior to the commencement of the next Renewal Term (as defined below) and (b) Landlord shall be able to terminate this Lease only in the event of a material default by Tenant, which default is not cured within sixty (60) days of Tenant's receipt of written notice thereof, provided, however, in the event that Tenant has diligently commenced to cure a material default within sixty (60) days of Tenant's actual receipt of notice thereof and reasonably requires additional time beyond the sixty (60) day cure period described herein to effect such cure, Tenant shall have such additional time as is necessary (beyond the sixty [60] day cure period) to effect the cure.  References in this Amendment to "*Renewal Term*" shall refer, collectively, to the Existing Renewal Term(s) and the New Renewal Term(s).  The Landlord hereby agrees to execute and return to Tenant an original Memorandum of Lease in the form and of the substance attached hereto as **Exhibit B** and by this reference made a part hereof (the "*Memorandum*") executed by Landlord, together with any applicable forms needed to record the Memorandum, which forms shall be supplied by Tenant to Landlord.

3.  **Rent and Escalation**. The Parties hereby acknowledge and agree that all applicable increases and escalations to the rental payments under the Lease (the "*Rent*") shall continue in full force and effect through the New Renewal Term(s).  Notwithstanding anything to the contrary contained in the Lease, all Rent and any other payments expressly required to be paid by Tenant to Landlord under the Lease and this Amendment shall be paid to **Paul and Barry Miller Partnership, LLC**.

4.  **Landlord and Tenant Acknowledgments**. Except as modified herein, the Lease and all provisions contained therein remain in full force and effect and are hereby ratified and affirmed. The Parties hereby agree that no defaults exist under the Lease.  To the extent Tenant needed consent and/or approval from Landlord for any of Tenant's activities at and uses of the site prior to the Effective Date, including subleasing to American Tower, Landlord's execution of this Amendment is and shall be considered consent to and approval of all such activities and uses and confirmation that no additional consideration is owed to Landlord for such activities and uses.  Landlord hereby acknowledges and agrees that Tenant shall not need consent or approval from, or to provide notice to, Landlord for any future activities at or uses of the Leased Premises, including, without limitation, subleasing and licensing to additional customers, installing, modifying, repairing, or replacing improvements within the Leased Premises, and/or assigning all or any portion of Tenant's interest in this Lease, as modified by this Amendment. Tenant and Tenant's sublessees and customers shall have vehicular (specifically including truck) and pedestrian access to the Leased Premises from a public right of way on a 24 hours per day, 7 days per week basis, together with utilities services to the Leased Premises from a public right of way. Upon request by Tenant and at Tenant's sole cost and expense but without additional consideration owned to Landlord, Landlord hereby agrees to promptly execute and return to Tenant building permits, zoning applications and other forms and documents, including a memorandum of lease, as required for the use of the Leased Premises by Tenant and/or Tenant's customers, licensees, and sublessees. The terms, provisions, and conditions of this Section shall survive the execution and delivery of this Amendment.

5.  **Limited Right of First Refusal**. Notwithstanding anything to the contrary contained herein, this paragraph shall not apply to any fee simple sale of the Parent Parcel from Landlord to any prospective purchaser that is not a Third Party Competitor (as herein defined) or to American Tower.  If Landlord receives an offer or desires to offer to:  (i) sell or convey any interest (including, but not limited to, leaseholds or easements) in any real property of which the Leased Premises is a part to any person or entity directly or indirectly engaged in the business of owning, acquiring, operating, managing, investing in or leasing wireless telecommunications infrastructure (any such person or entity, a "*Third Party Competitor*") or (ii) assign all or any portion of Landlord's interest in the Lease to a Third Party Competitor (any such offer, the "*Offer*"), Tenant shall have the right, exercisable in Tenant's sole and absolute discretion, of first

**Add.18**

addresses from those set forth above. Refusal to accept delivery of any notice or the inability to deliver any notice because of a changed address for which no notice was given as required herein, shall be deemed to be receipt of any such notice.

9. **Counterparts**. This Amendment may be executed in several counterparts, each of which when so executed and delivered, shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument, even though all Parties are not signatories to the original or the same counterpart. Furthermore, the Parties may execute and deliver this Amendment by electronic means such as .pdf or similar format. Each of the Parties agrees that the delivery of the Amendment by electronic means will have the same force and effect as delivery of original signatures and that each of the Parties may use such electronic signatures as evidence of the execution and delivery of the Amendment by all Parties to the same extent as an original signature.

10. **Governing Law**. Notwithstanding anything to the contrary contained in the Lease and in this Amendment, the Lease and this Amendment shall be governed by and construed in all respects in accordance with the laws of the State or Commonwealth in which the Leased Premises is situated, without regard to the conflicts of laws provisions of such State or Commonwealth.

11. **Waiver**. Notwithstanding anything to the contrary contained herein, in no event shall Landlord or Tenant be liable to the other for, and Landlord and Tenant hereby waive, to the fullest extent permitted under applicable law, the right to recover incidental, consequential (including, without limitation, lost profits, loss of use or loss of business opportunity), punitive, exemplary and similar damages.

12. **Tenant's Securitization Rights; Estoppel**. Landlord hereby consents to the granting by Tenant and/or American Tower of one or more leasehold mortgages, collateral assignments, liens, and/or other security interests (collectively, a "***Security Interest***") in Tenant's (or American Tower's) interest in this Lease, as amended, and all of Tenant's (or American Tower's) property and fixtures attached to and lying within the Leased Premises and further consents to the exercise by Tenant's (or American Tower's) mortgagee ("***Tenant's Mortgagee***") of its rights to exercise its remedies, including without limitation foreclosure, with respect to any such Security Interest. Landlord shall recognize the holder of any such Security Interest of which Landlord is given prior written notice (any such holder, a "***Holder***") as "Tenant" hereunder in the event a Holder succeeds to the interest of Tenant and/or American Tower hereunder by the exercise of such remedies. Landlord further agrees to execute a written estoppel certificate within thirty (30) days of written request of the same by Tenant, American Tower or Holder.

13. **Taxes**. During the term of the Lease, Landlord shall pay when due all real property, personal property, and other taxes, fees and assessments attributable to the Parent Parcel, including the Leased Premises. Tenant hereby agrees to reimburse Landlord for any personal property taxes in addition to any increase in real property taxes levied against the Parent Parcel, to the extent both are directly attributable to Tenant's improvements on the Leased Premises (but not, however, taxes or other assessments attributable to periods prior to the Effective Date), provided, however, that Landlord must furnish written documentation (the substance and form of which shall be reasonably satisfactory to Tenant) of such personal property taxes or real property tax increase to Tenant along with proof of payment of same by Landlord. Anything to the contrary notwithstanding, Tenant shall not be obligated to reimburse Landlord for any applicable taxes unless Landlord requests such reimbursement within one (1) year after the date such taxes became due. Landlord shall submit requests for reimbursement in writing to: *American Tower Corporation, Attn: Landlord Relations, 10 Presidential Way, Woburn, MA 01801* unless otherwise directed by Tenant from time to time. Subject to the requirements set forth in this Section, Tenant shall make such reimbursement payment within forty-five (45) days of receipt of a written reimbursement request from Landlord. Tenant shall pay applicable personal property taxes directly to the local taxing authority to the extent such taxes are billed and sent directly by the taxing authority to Tenant. If Landlord fails to pay when due any taxes affecting the Parent Parcel as required

**Add.19**

**LANDLORD:**

**Paul and Barry Miller Partnership, LLC,**

a Rhode Island limited liability company

Signature: _____

Print Name: _____PAUL R MILLER_____

Title: _____OWNER_____

Date: _____4-7-17_____

Signature: _____Barry N. Miller_____

Print Name: _____BARRY N. MILLER_____

Title: _____PARTNER_____

Date: _____4-7-2017_____

[*SIGNATURES CONTINUE ON FOLLOWING PAGE*]

**Add.20**

**TENANT:**

**SBC Tower Holdings, LLC**

a Delaware limited liability company

Signature: _____

Print Name: **Gram Meadors**

Title: **AVP Sourcing Operations**

Date: _____

Prepared by:
Attorney Jasveer Jabbal
American Tower Corporation
10 Presidential Way
Woburn, MA 01801
Attn: Land Management
ATC Site #: 308757
Site Name: Warwick RI 1

Prior Recording Reference: November 1, 2017 in Book 8934 at Page 277 as Instrument 16371
Tax Parcel ID: 278-0123-0000

## ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT

This Assignment and Assumption of Lease Agreement (this "**Agreement**") is made and entered into effective as of ___DEC 19___, 2018, (the "**Effective Date**"), by and between SBC Tower Holdings LLC, a Delaware limited liability company, with a mailing address of 575 Morosgo Drive, Atlanta, GA 30324 (FA# 10006866) ("**Assignor**"), and American Tower Asset Sub II, LLC, a Delaware limited liability company, with a mailing address of 10 Presidential Way, Woburn, MA 01801, Attn: Land Management ("**Assignee**").

I.    **Recitals**

A.    Assignor, as seller, and Assignee, as purchaser, are parties to that certain Lease and Sublease, dated as of December 14, 2000 (the "**Purchase Agreement**"), pursuant to which Assignor is transferring the Sites (as defined in the Purchase Agreement) to Assignee.

B.    Assignor is the current lessee under that certain Cellular Property Lease, dated May 1, 1990 (the "**Ground Lease**"), by and between The Paul and Barry Miller Partnership, as the original landlord, and Providence Cellular Telephone Company, as predecessor-in-interest to Assignor, relating to a parcel of real property in Kent County, State of Rhode Island (the "**Premises**"), as more particularly described in **Exhibit A** and further in the Ground Lease.

C.    In accordance with the terms of the Purchase Agreement, Assignor desires to assign its right, title and interest in and to the Ground Lease to Assignee, and Assignee desires to acquire and assume Assignor's rights and obligations under the Ground Lease (the "**Assignment**").

1

**Add.22**

NOW, THEREFORE, in consideration of the agreements contained herein and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties hereto agree as follows:

1.    Assignment of Ground Lease.  As of the Effective Date, Assignor does assign, transfer, and set over unto Assignee, with only the warranties expressly stated in the Purchase Agreement, all of the right, title and interest of Assignor in, to and under the Ground Lease, subject to the terms, covenants and conditions contained in or with respect to the Ground Lease and all terms and conditions of all related easements and ancillary agreements.

2.    Assumption of Ground Lease.  Effective as of the Effective Date, Assignee assumes and accepts the foregoing assignment on the terms and conditions set forth in this Assignment, and Assignee assumes and agrees to keep, observe and perform all of the terms, covenants, agreements, conditions and obligations of the Ground Lease on the part of Assignor to be kept, observed and performed which accrue as of the Effective Date (collectively, the "**Assumed Liabilities**"), with the same force and effect as if Assignee instead of Assignor (or its predecessor) had originally signed the Ground Lease.

3.    Terms of Purchase Agreement Control.  Nothing contained in this Agreement shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge, or in any way affect the provisions of the Purchase Agreement, including the warranties, covenants, agreements, indemnification, conditions and representations contained in the Purchase Agreement and, in general, any of the rights and remedies, of Assignor or Assignee set forth in the Purchase Agreement.

4.    Amendments.  This Agreement may not be amended, modified or terminated except by an instrument in writing executed by the parties to this Agreement.

5.    Headings.  The headings of the various sections of this Agreement have been inserted only for the purpose of convenience and are not part of this Agreement and shall not be deemed in any manner to modify, expand, explain or restrict any of the provisions of this Agreement.  Words of any gender used in this Agreement shall include any other gender and words in the singular shall include the plural, and vice versa, unless the context requires otherwise.

6.    Successors and Assigns.  This Agreement shall bind and inure to the benefit of Assignor, Assignee, and their respective successors and assigns.

7.    Governing Law.  The laws of the State of Rhode Island govern the validity, construction, enforcement and interpretation of this Agreement without reference to its conflict of laws principles.

8.    Counterpart Signatures.  This Agreement may be executed in any number of counterparts, any one of which shall constitute an original of this Agreement and all of which together shall constitute one and the same instrument.  When counterparts have been executed by all parties, they shall have the same effect as if the signatures to each counterpart or copy were upon the same documents and copies of such documents shall be deemed valid as originals.

9.    Drafting.  This Assignment has been prepared by Assignee and its professional advisors and reviewed by Assignor and its professional advisors. Assignor, Assignee and their separate advisors believe this Assignment is the product of all of their efforts, that it expresses their agreement and that it should not be interpreted in favor of either Assignor or Assignee or against either Assignor or Assignee merely because of their efforts in preparing it.

2

**IN WITNESS WHEREOF**, the parties have executed this Assignment and Assumption of Lease Agreement as of the Effective Date.

SBC Tower Holdings LLC

By: _____
Name: Gram Meadors
Title: AVP Sourcing Operations

Witnesses:

Name: _____

Name: _____

STATE OF TEXAS         }
              } ss.
COUNTY OF DALLAS       }

On this 18 day of December, 2018, before me, the undersigned notary public, personally appeared Gram Meadors, the Assistant Vice President Sourcing Operations of SBC TELECOM, INC., the managing member of SBC TOWER HOLDINGS LLC, proved to me through satisfactory evidence of identification, which was a driver's license, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.



Notary Public

Print Name Taylor Schilling

My commission expires 01 / 16 / 2020

**Taylor Schilling**
Notary Public, State of Texas
Commission # 128849139
Expires: 01/16/2020

(Use this space for notary stamp/seal)

Assignment and Assumption of Lease Agreement
ATC Site Name/Number: Warwick RI 1 / 308757

3

**Add.24**

**American Tower Asset Sub II**
a Delaware limited liability company

By: _____
Name:
Title:   RICHARD ROSSI
         SENIOR VICE PRESIDENT
         GENERAL COUNSEL US TOWER

Witnesses:

Name: Natalie Casey

Name: Patrick McKeon

COMMONWEALTH OF MASSACHUSETTS          )
                                       ) ss.
COUNTY OF MIDDLESEX                     )


On this _14_ day of _December_, 2018, before me, the undersigned notary public, personally appeared _Richard Rossi_, _SVP_ of _American Tower Asset Sub II, LLC_, proved to me through satisfactory evidence of identification, which was a driver's license, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

Notary Public

Print Name: _Charles Marquis_

My commission expires _12/7/23_

CHARLES MARQUIS
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 7, 2023

(Use this space for notary stamp/seal)